EQUITABLE BUILDING & LOAN ASSOCIATION *v.* BRADY.
EQUITABLE BUILDING & LOAN ASSOCIATION *v.* LOVETT.

Nos. 7964, 7965.   December 11, 1930.

*Oliver & Oliver* and *Lawton & Cunningham,* for plaintiff in error. *John E. Schwarz, J. E. Manucy Jr., Henry McAleer,* and *Julian Hartridge,* contra.

GILBERT, J. ■ The court did not err in overruling the general demurrers to the two petitions. If the petitions set out a cause of action either for an equitable remedy or for a common-law remedy, the petition would not be dismissed, but the general demurrer would be overruled, and petitioners would be allowed to proceed for whatever remedies were available under the petition. Therefore, even if it be considered that under the allegations of the petitions the complainants were not entitled to the extraordinary remedies of a court of equity, that would furnish no just cause for dismissing the petitions. Moreover, the Civil Code (1910), § 4621, declares: "In all cases of fraud (except fraud in the execution of a will) equity has concurrent jurisdiction with courts of law." The petitions alleged that complainants were induced to enter into a contract for the purchase of what they termed "certificates of stock which had the same force and general characteristics as demand certificates issued by the several banking institutions of the State;" that this contract was not in writing, but was in parol; also that it was represented that the stock issued to them would be in the nature of demand certificates, that is, certificates bearing seven per cent. interest, which the holders could resell to the company and receive the full amount of cash paid in by them, on demand. It was alleged in each petition that the petitioner was "in no wise familiar" with the customs of banking business or usages, that he knew nothing whatever of the phraseology of demand certificates, certificates of stock, or any kind of certificates, and because of his lack of knowledge he accepted as true the fraudulent and deceitful representations of the defendant's agents, and, relying solely upon them, agreed to invest his money and to accept as evidence thereof stock certificates. The petitions as amended prayed "that the oral contract that petitioner had been fraudulently induced to enter be rescinded."

The relief by way of rescission of the contract on the ground of fraud is clearly within the jurisdiction of a court of equity. It is pointed out in the brief of plaintiff in error, but not urged by way of demurrer, that the court is called upon to rescind an oral contract. It has been held that a court of equity may rescind an

oral, as well as a written contract. 13 C. J. 611, § 652. Warnes *v.* Brubaker, 107 Mich. 446 (65 N. W. 276). According to the allegations of the petitions, the oral contracts made with the company in no sense contemplated making the petitioners members of the association or shareholders in it in the ordinary sense. Had the contract been carried out by the company according to the oral contract, the petitioners would have been merely creditors of the association; for, whatever the name of the instrument issued, if its terms correspond with the contract as alleged, the true relations of the parties would have been that of borrower and lender. *Cook* v. *Equitable Building & Loan Association,* 104 *Ga.* 814 (5), opinion at p. 828 (30 S. E. 911) ; *Savannah Real Estate Loan &c. Co.* v. *Silverberg,* 108 *Ga.* 281 (33 S. E. 908). The defendant in error in the *Cook* case bore the same name as the plaintiff in error in these cases, and may possibly be the same company, though it does not appear from the records. The facts of that case in some respects were very similar to the facts of this case. In the opinion in that case it was said : " The holders of this stock paid the association its full face value, $100 per share, and the stock thus acquired bears interest at the rate of 6 per cent. per annum, payable semiannually. The purchaser has the right, after 90 days notice, to receive back the money paid for the stock, and the association has a like privilege, upon 6 months notice, of refunding to the purchaser the money paid therefor, and taking up the stock. The holder of this stock has really no interest in the profits or losses of the business of the association. The association can never be under any obligation to pay him more than it has actually received from him, with interest; nor can it ever discharge its obligation to him by paying him less. We can not' possibly distinguish this from any other case of borrowing and lending money. It is just as if the association had obtained money on its note or bond due upon 90 days after demand, with interest. It matters not what name is given to its obligation, whether stock, note, or bond; the nature of the transaction, whether it be a pure borrowing of money or not, is determined by the real substance and effect of the contract between the parties."

Under the facts alleged, therefore, the complainants did not receive what they contracted to buy. They did receive stock membership certificates of a totally different character. It was

alleged that the certificates were "nothing but membership certificates." As members of the association, the complainants would not have been creditors of the association, and they would not have had the very important privilege for which they contracted, that is, to resell their certificates to the company on demand and receive back the full amount paid in, with interest at seven per cent. If it was the intention of the company, acting through its agents, at the time the oral contract was entered into not to issue to complainants the kind of demand certificates which they agreed, but to issue them the vastly different character of certificate which they did issue, then there can be no question that the company perpetrated a gross fraud on the complainants, which undoubtedly would entitle them to a rescission of the oral contract, and to judgment for the amount of money paid in by them, with seven per cent. interest. "Fraud voids all contracts." Civil Code. (1910), § 4254. Where one is fraudulently induced to enter into a contract, he may rescind the contract and recover back what he has paid, or, if he has not paid, he may resist any action brought against him on the contract, or he may resist a suit in equity by the other side for specific performance, or he may himself sue in equity to have the contract judicially canceled and rescinded. Clark on Contracts (3d ed), 290, § 140 et seq. On the other hand, if, from lack of agreement or understanding between the parties, there never was any meeting of minds, then and in that event there was no valid contract, and the company should have returned the money paid by complainants when demand was made with the tender back of the certificates issued. Both petitions allege that, promptly on ascertaining that the company had not issued demand certificates of the character agreed, petitioners made demand and tendered back the certificates. Whether this tender was made with the promptitude required by law is discussed in the next division of this opinion. As shown in the statement of facts in the case of Lovett, upon delivery of the certificates to him he made complaint concerning some of the language contained therein, and was given further assurances. Plaintiffs in error cite *Feingold* v. *McDonald Mortgage & Realty Co.*, 166 *Ga.* 838 (145 S. E. 90), in which this court has applied the principle that "An entirely different contract from that evidenced by a writing can not be pleaded or proved by parol as a substitute for that embodied in such writing." And

also, "A false statement is not fraudulent when there is no reason why the statement should be believed or acted upon." Other cases decided by this court, applying the same principles, are cited. We do not think those cases are applicable. The petitioners are not undertaking to substitute another and different contract for the membership stock certificates. The latter certificates would make petitioner shareholders, a relation never contemplated by the contract made, and never in fact agreed to or accepted by them. As between the corporation and its shareholders the stock certificate is of course in a sense a contract when accepted, but complainants are refusing to accept them. The petitions allege that the fraudulent representations were believed and acted upon, and state reasons for placing confidence in such representations. It appears that complainants had fully performed their oral contracts by payment of the sums agreed upon by them before the membership certificates were delivered, and that they did all within their power to have the contract executed as agreed upon.

■ It is insisted that the petition should have been dismissed because of laches on the part of the petitioners. It is a settled rule, that, while a contract may be rescinded at the instance of the party defrauded, the party seeking rescission must act promptly upon discovering the fraud and must restore or offer to restore to the other party whatever he has received by virtue of the contract if it be of any value. Civil Code (1910), § 4305. *Couch* v. *Crane,* 152 *Ga.* 18, 22 (108 S. E. 448) ; *Hinkle* v. *Hinkle,* 148 *Ga.* 250 (3) (96 S. E. 340) ; and see *Feingold* v. *McDonald Mortgage & Realty Co.,* 166 *Ga.* at p. 845 (supra). The word "promptly," as used in Code § 4305 means within a reasonable time. *Kerr Glass Mfg. Co.* v. *Americus Grocery Co.,* 13 *Ga. App.* 512 (79 S. E. 381) ; *Stovall* v. *McBrayer,* 20 *Ga. App.* 93 (92 S. E. 543) ; and see also *Feingold* v. *McDonald Mortgage Co.,* supra, at p. 845. The party aggrieved must act with the promptitude which the nature of the case and the circumstances require. *Jordy* v. *Dunlevie,* 139 *Ga.* 325 (77 S. E. 162). Whether one has exercised the reasonable diligence required must depend upon the facts of each particular case. 13 C. J. 616, §§ 670, 671. "The doctrine [of laches] can not be invoked to defeat justice; and it will be applied only where the enforcement of the right asserted would work injustice. The defense of laches is peculiar to courts of equity, and is not pleadable

in actions at law. . . There is no absolute rule as to what constitutes laches or staleness of demand, and no one decision constitutes a precedent in the strict sense for another. Each case is to be determined according to its own particular circumstances. In other words, the question of laches is addressed to the sound discretion of the chancellor, and his decision will not be disturbed on appeal unless it is so clearly wrong as to amount to an abuse of discretion. In determining whether there has been laches, there are various things to be considered, notably the duration of the delay in asserting the claim, and the sufficiency of the excuse offered in extenuation of the delay, whether plaintiff acquiesced in the assertion or operation of the corresponding adverse claim, the character of the evidence by which plaintiff's right is sought to be established, whether during the delay the evidence of the matters in dispute has been lost or become obscured or the conditions have so changed as to render the enforcement of the right inequitable, whether third persons have acquired intervening rights, the nature of the right asserted and the relief asked, the nature of the duty or obligation sought to be enforced, and whether plaintiff or defendant was in possession of the property in suit during the delay. To charge a party with laches in delaying to assert a right, an opportunity to have acted sooner must have existed; if he acted at the first possible opportunity, he is not culpable. So if a party sues substantially as soon as occasion arises for an assertion of his rights, laches is not imputable to him. . . Lapse of time is an important element of laches; yet, unless a case falls within the operation of the statute of limitations, there is no fixed period within which a person must assert his claim or be barred by laches; the length of time depends on the circumstances of the particular case. Laches is not, like limitations, a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced, an inequity founded on some intermediate change in conditions. Whether delay in asserting one's rights constitutes laches depends on whether it was reasonable under the circumstances. If the delay was reasonable, it does not of itself bar relief; if unreasonable, relief will ordinarily be denied. . . In some cases long lapse of time has been held sufficient of itself to prevent relief. But mere delay in asserting a right does not ipso facto bar its enforcement in equity, by the great weight of au-

thority, unless the case is barred by the statute of limitations. To constitute a defense, the delay must have been such as practically to preclude the court from arriving at a safe conclusion as to the truth of the matters in controversy, and thus make the doing of equity either doubtful or impossible, as through loss or obscuration of evidence of the transaction in issue, or there must have occurred in the meantime a change in conditions that would render it inequitable to enforce the right asserted, or, as commonly phrased, the delay must have worked injury, prejudice, or disadvantage to defendant or others adversely interested, or plaintiff must have abandoned or waived his right, or acquiesced in the assertion or operation of the adverse right, or lost his own right by estoppel; or sufficient time must have elapsed to create or justify a presumption against the existence or validity of plaintiff's right; or a presumption that if plaintiff was ever possessed of a right, it has been abandoned or waived or has been satisfied, or that in consequence of the delay the adverse party would be inequitably prejudiced by the enforcement of the right asserted." 21 C. J. 212, 225, §§ 212, 217, 218, 219, and cit. These are general principles stated from the text cited.

This court, in *Overland Motor Co.* v. *Maryland Casualty Co.*, 147 *Ga.* 63, 69 (92 S. E. 931), where the suit was brought after the termination of the period of time for which the liability insurance under the policy had expired, in dealing with the question of laches held that the policyholder was not estopped, and applied the doctrine announced in Summers *v.* Alexander, 30 Okla. 198 (120 Pac. 601, 38 L. R. A. (N. S.) 787), as follows: "'One to whom a distinct and definite representation has been made is entitled to rely on such representation, and need not make further inquiry concerning the particular facts involved; and where the transaction involved the taking out of a particular kind of life-insurance policy, the holder had a right to rely upon the belief that the agent would carry out his agreement in conformity to the original contract; and the failure of the agent to do so, whether the result of a mistake or a deliberate fraud, can not operate to the prejudice of such holder in an action brought by the agent to enforce the collection of premium notes.' The same question is dealt with in the case of Pfiester *v.* Missouri State Life Ins. Co., 85 Kan. 97 (116 Pac. 245). In the course of the opinion it was

said: 'If the insured or the plaintiff had discovered the omission from the application, and the error in the policy, it would have been his duty to call them to the attention of the company, and have the necessary corrections made. Delay would have indicated acquiescence, and, if sufficiently prolonged, might have affected the right to the equitable remedy of reformation; but there is no evidence that the mistakes were discovered until the policy had matured by the death of the insured. Meanwhile the plaintiff and the insured were not negligent in failing to examine the application or the policy, and were justified in supposing that they had been written as contemplated.' Other recent cases to the same effect are: Carlton Lumber Co. *v.* Lumber Ins. Co., 81 Or. 396 (158 Pac. 807, 159 Pac. 969); Salmon *v.* Farm Property Mut. Ins. Assn., 168 Iowa, 521 (150 N. W. 680). Applying the foregoing principles, it is readily seen that the defendant could not be held barred, as a matter of law, from failure of its president to read the policy and make an earlier discovery of the alleged fraud. It follows that it was erroneous to strike so much of the plea as set up the defense mentioned, and there must be a reversal of the judgment." Under the facts alleged in the instant cases, it can not be held as a matter of law that the complainants were guilty of such laches as to be estopped, and that the petition should have been dismissed on that ground.

Plaintiffs in error cite, as a reason why the court should have sustained the general demurrer, the case of *Weaver* v. *Roberson*, 134 *Ga.* 149 (supra), where it was held: "Equity will not reform a written contract because of mistake as to the contents of the writing on the part of the complaining party (who was able to read) and fraud of the other party which consists only in making false representations as to such contents, on which the complaining party relied as true because of confidence in the party making them, no fiduciary or confidential relation existing between the parties, and no sufficient excuse appearing why the complaining party did not read the contract." That ruling, however, is not applicable, because complainants are not endeavoring to set aside or rescind the membership certificate which was actually delivered. They rejected these certificates, and are asking to set aside another and totally different contract. It does not appear from the petitions that the membership certificates were signed by the complainants,

or that they were obligated to sign them. The principles announced, therefore, in *Overland Motor Co.* v. *Maryland Casualty Co.,* supra, are directly applicable. In that case the holder of a liability policy in the casualty company received a policy different in character from that for which he had orally contracted; and it was held that a court of equity should have reformed the contract at the suit of the policyholder. In the present cases the complainants are not seeking to reform the certificates, but to rescind the contract, though the principles are the same. In the case cited the policyholder did not sign the liability policy. In both cases it was urged that relief could not be granted, because the complaining parties were able to read, and, failing to exercise due diligence, were not entitled to relief. In the *Overland* case this court said: "The element of inability on the part of defendant's president to read does not enter into the case. The pivotal question is whether there is sufficient reason for his failure to read the policy. Contracts of insurance differ from contracts of the character mentioned in the case cited above (a contract for the lease of a hotel), and contracts of a similar nature, in which both parties sign. The case of *Niagara Fire Insurance Co.* v. *Jordan,* 134 *Ga.* 667 (68 S. E. 611, 20 Ann. Cas. 363), involved the reformation of a contract of insurance, and in principle is very similar to the case under consideration. It was there held: 'Where, on oral application for a policy of insurance to indemnify the applicant against loss by fire for the period of one year, the proper agent of the insurer agrees to issue to the applicant a policy of insurance as contracted for, but by mistake of the insurer's agent another's name is inadvertently inserted therein as the insured, and the policy is delivered to the applicant by the insurer, who collects the premium, and the applicant retains the policy without discovering the mistake until after sustaining a loss by fire nearly three months thereafter, equity will reform the policy so as to make it accord with the oral agreement between the parties.' In that case the controlling question was whether the insured was guilty of laches in failing to read the policy; or, in other words, was there any excuse for failure to read it and discover that it was different from the preliminary agreement? The policy had been in the possession of the insured for nearly three months, and the mistake was not discovered until after there was a loss. In the course of the opinion it was said by Evans,

P. J.: 'The trend of authority is that a mere failure of the insured to read his policy does not amount to such laches as will debar him from having such policy reformed for mistake therein. . . . A policy of insurance is issued by the insurer and signed by him or his agent; it is not contemplated that the insured shall sign it. In the insurer's promise to deliver an accurate policy, according to his oral agreement with the insured, the insured has a just expectation that there will be no designed variance. A man should not be permitted for his pecuniary advantage to impute it to another as gross negligence that the other trusted to his fidelity to his promise. . . . The case is quite different from those instances where a man who has negligently signed a contract endeavors to be relieved of its obligation by setting up his own negligence. The fact that the policy as actually made out was in the plaintiff's hands for nearly three months, and until after the fire occurred, is a circumstance to be weighed by the jury as bearing on the truth of the allegation that the policy did not pursue the oral contract.' In other courts this line of reasoning has been applied in recent cases." Outside authorities were cited.

■ Plaintiffs in error urge that at least the court should have sustained the special demurrer, which undertakes to point out that copies of the membership certificates issued by the company are not attached to the petition, and the terms of the certificates are not sufficiently set out. Even if good pleading required complainants to furnish the information called for by the special demurrer, the failure to do so will not, in this case, require reversal of the judgments. This case differs in its facts from the case of *Social Benevolent Society* v. *Holmes*, 127 *Ga.* 586 (3) (56 S. E. 775), where it was held that a special demurrer to a petition, based on the ground that the charter and by-laws of the society were not attached to the petition, should have been sustained. In that case the charter and by-laws were relied upon by the plaintiff as constituting the contract upon which the action was founded. In this case the membership certificates are not relied upon as the contract upon which the action is founded. The court is obliged to know that the corporation issuing the certificates has full information of their terms, and doubtless has on hand an abundance of the same certificates. Moreover, the petitions allege that these certificates were tendered back to the company and were refused. If, how-

ever, on the trial of the case it should become material that the certificates should be introduced in evidence, the trial court possesses ample power to require their production.

■ The fifth headnote does not require elaboration.

■ ▪ There are a number of other questions discussed in the briefs, and a number of authorities cited by both parties, which have not been discussed. Because the case is controlled by the principles announced above, we do not deem it necessary to deal with other questions, or to discuss all of the authorities cited; nor is it necessary to discuss in detail the precise language of the various grounds of demurrer. We think it sufficient to say that the court did not err in overruling the demurrer to the petition.

*Judgment affirmed. All the Justices concur.*